## AS TO TITLE OF RANDOLPH SLAVES IN MERCER COUNTY LANDS.

Circuit Court of Mercer County.

JOSEPH MOTON AND YORK RYAL, FOR THEMSELVES AND OTHERS, v. BERNARD DEWELL ET AL, AND JOSEPH MOTON AND YORK RYAL, FOR THEMSELVES AND OTHERS, v. GERARD KESSENS.

Decided, May, 1910.

*Trust—Created by the Will of John Randolph—Involving Title to Mercer County Lands—Concealment of the Trust from the Beneficiaries—statute of Limitations—Laches—Failure to Bring Repudiation of the Trust Home to the Cestui que Trust—Character of the Title in the Beneficiaries—Parties—Presumption as to the Law of Another State.*

1. In an action against purchasers of real estate from an executor and successive grantees, wherein fraud is charged in the sale and alienation of said lands which were acquired by the executor with a trust fund, the fact that the executor is not represented in the action by a successor is not a fatal defect, where it appears from the facts alleged in the petition and admitted by demurrer the purchasers became *quasi* trustees and successors to the trust.

2. The bequest by John Randolph, of Virginia, for the purchase of lands in a free state, upon which his emancipated slaves were to be settled, was an absolute devise, and is capable of enforcement by a suit in equity, unless the right so to do has been lost through laches or the running of the statute of limitations.

3. But neither laches nor the bar of the statute runs against ignorant slaves emerging into a condition of freedom, with no knowledge of property rights or such an instrument as a will, and whose rights are admitted by demurrer to have been fraudulently concealed from them by the executor of the Randolph will; but were this not true the rights of those slaves and their descendants would still be preserved, inasmuch as the bar of the statute in force in Ohio at that time was not applied as between a trustee and his *cestui que trust* until after knowledge of a denial or repudiation of the trust had been brought home to the *cestui que trust.*

4. The interest conferred upon those slaves was in fee simple, and successive purchasers having knowledge of the trust are bound by it.

*J. D. Johnson* and *W. E. Henderson*, for plaintiffs.
*John W. Loree, P. E. Kinney* and *John G. Romen*, contra.

ALLREAD, J.; HURIN, J., and DONNELLY, J., concur.

The plaintiffs bring these actions on behalf of themselves and the survivors and other descendants of ex-slaves of the late John Randolph, of Roanoke, Virginia, who died testate May 24th, 1833, and whose will was on December 7th, 1837, admitted to probate in the general court of Virginia at the capital.

By the provisions of the will John Randolph gave and bequeathed to all his slaves their freedom, and in addition gave to William Leigh, as executor of his estate, a sum of money not exceeding eight thousand dollars, or so much thereof as was necessary, to transport and settle said slaves in some other state or territory in the United States, giving to all above the age of forty not less than ten acres of land. By codicil, three thousand pounds sterling, or about fifteen thousand dollars, was bequeathed to said executor as a fund for carrying into execution the will respecting said slaves.

The executor named duly qualified and entered upon the trust, raised the fund provided for this purpose, and on May 19th, 1846, from the fund so raised, purchased lands in Mercer county, Ohio, taking the title in fee simple in his own name as executor of said will.

Proceedings had been commenced in the general court of the state of Virginia at the capital for the purpose of releasing said slaves from the bondage of slavery, resulting on May 4th, 1846, in an order for their release, and the granting of passports to another state. Shortly thereafter the slaves were transported by the executor from their domicile in Virginia to the southern part of the state of Ohio, and from forty to sixty miles from the lands so purchased and in a different county.

The executor on October 26th, 1846, executed a power of attorney to Joseph Plunkett to sell and convey the lands in Mercer county, and the same were sold and conveyed by said attorney in fact, one tract in 1849, and the other in 1852. The deed to the executor, the power of attorney, and the subsequent deeds of the attorney in fact, were each recorded shortly after execution in the recorder's office in Mercer county. Re-sale of the lands by the executor was made without any order or authority of any court, and without the authority of the will.

It is averred in the third amended petition, upon which the case now stands, that the executor did not settle said slaves or any of them upon the lands so purchased, nor did he give said slaves any land, money or property in lieu thereof. The amended petition contains charges of fraud against the executor in the re-sale of the lands, extending to the suppression of all knowledge from the liberated slaves and their descendants and the concealment of their rights; that the purchasers from the executor and their successive grantees down to the present owners took the property with full knowledge of the trust and of the fraud, and also aided in the concealment from the slaves and their descendants of all knowledge of their rights. It is also averred that the ex-slaves were illiterate, ignorant, could neither read nor write, and that neither they nor their descendants had any knowledge of the will, its terms and conditions, the purchase of lands for their benefit, the acts, proceedings, etc., of the executor, or the fraud; and no means of knowing, and could not and did not discover the facts or their rights until about the time suit was brought.

A demurrer was presented and sustained by the court of common pleas to the third amended petition, containing the facts above stated, and final judgment rendered against the plaintiffs, who, by a petition in error, here seek to have the judgment reversed.

Various reasons are advanced in support of the demurrer. Counsel, both in oral and written argument, have shown extraordinary research and ability *pro* and *con.*

It is contended that a successor to William Leigh, as executor, should be appointed in the courts of Virginia and made party here. We think that the absence of a successor to William Leigh is not a fatal defect, for under the facts stated and admitted by the demurrer the purchasers became *quasi* trustees and successors, so far as the real estate in Mercer county is concerned, to the executor.

So, also, we are of the opinion that one or more of the ex-slaves or their descendants may bring and prosecute the action for themselves and the others similarly interested. Joseph Moton is averred to be a descendant of slave parents over forty, and

York Ryal, a descendant of a slave mother under forty years at the death of Randolph. Each class of slaves referred to in the provisions of the will is therefore represented.

When the executor, after having invested the funds, failed to further execute the trust by settling the slaves on the land, and conveyed it to a purchaser who took with full knowledge, the ex-slaves had the right, in due time, to appeal to a court of equity in the jurisdiction of the land to declare and enforce the trust created by the will and impressed upon the lands by investment of the funds specially raised and set apart. And inasmuch as the interests could only be assigned in severalty by the act of settling the slaves and making the allotments, the right to bring the suit is joint.

While broad discretion was confided by the terms of the will in the executor as to the manner of carrying out the benevolent object and purpose, yet the direction to purchase lands in anther state or territory and to transport and settle the slaves, giving the elder class at least ten acres, and to employ so much of the funds provided as was necessary, was imperative. The right to give or withhold as to the main objects did not rest in the discretion of the executor, but was conferred by absolute devise. Such bequest is therefore capable of enforcement by a suit in equity, unless the right thereto is lost by laches or limitation.

The plaintiffs rely upon their want of knowledge and the fraudulent concealment of the executor to relieve the bar of the statute of limitations. On the other hand, the defendants contend that, notwithstanding the averments of the petition that the slaves and their descendants had no knowledge and could not have discovered the facts upon which their right is founded, yet the court will be forced to conclude from the general situation and common knowledge of the race and class of persons involved that they did know or could by reasonable diligence have discovered in due time to bar the action, the facts necessary to their cause. This inference, as counsel contend, is based upon the intimate knowledge and acquaintance which must be assumed of the slaves with John Randolph and his benevolent purpose during life; upon the report and reputation following

his death and publication of his will during the thirteen years of domicile on the old plantation in Charlotte county, Virginia, of the pendency of the proceedings to probate the will, the release of the slaves from bondage with all the attendant agitation and discussion, upon their manumission, the dissolution of bondage, passports and transportation under provision of the executor into a free state and almost within sight of the land provided for, where it may be assumed they settled, and where they and their descendants have lived for sixty years.

In consideration of this contention it may be conceded that, if the only rational deduction from the situation and admitted facts surrounding the parties is inconsistent with the special averment of want of notice and diligence as to discovery, the latter may be disregarded; but if not wholly inconsistent, the averments must be reconciled upon the demurrer. It can hardly be doubted that the Randolph slaves, although ignorant and unlettered, spread the news of their emancipation and repeated and handed down to posterity as tradition the oft-told story of their journey to the land of freedom, but resort to common knowledge might reasonably lead to the conclusion that to the liberated slaves their freedom was the chief thought—the priceless boon—about which clustered their fondest hope and highest aspiration, and afforded undoubtedly the chief topic of discussion. But it does not clearly and necessarily follow that, emerging from the condition of slavery and with little, if any, knowledge of property or property rights, ignorant and unable to read, the slaves knew, discussed or imparted to their descendants any knowledge of their property rights, although such rights are conferred by the same instrument which granted their freedom. It is specially urged that the proceedings of the general court of Virginia for their emancipation and the judgment and passports resulting charged the slaves with knowledge of the provisions of the will and of their rights. It does not, however, either expressly nor as a necessary inference, appear that the slaves instituted the suit or were parties.

A slave might in some of the slave states have maintained a suit against the person claiming his bondage. *James (colored)* v. *Walker,* 18 B. Mon. (Ky.), 605.

A more appropriate suit would have been on behalf of the executor to confirm the manumission provided in the will, and as the proceedings here were in the court probating the will and administering the estate, and not at the domicile of both the slaves and the executor, the inference in support of the theory of the executor having brought the suit is strengthened.

The inference of knowledge of property rights by the ignorant slaves from the judgment of the court dissolving the bondage, their passports and journey into the free state, is by no means conclusive so as to overcome other positive averments admitted by the demurrer.

It is still further contended that the amended petition does not allege that the descendants of the slaves are ignorant or illiterate, and that, therefore, their knowledge of property rights from lapse of time and proximity of residence must be conclusively presumed. But it will be noted that about fifty of the John Randolph slaves were still living when the suit began, and as to descendants of those deceased, it does not appear that they were in such contact with the stirring events of their ancestors' emancipation and exodus as to lead to a necessary inference of knowledge of their property rights. The only means of knowledge necessarily inferred from the state of facts contained in the petition lay with their ancestors, who can not be held to have transmitted greater information than they possessed. The petition does not inform us of the date of the death of any of the ancestors, and we can not, therefore, from the petition determine as to the beginning of the tolling of the statute of limitations as to any of the descendants.

The foundation of the present cause of action arises from the investment of the trust funds in the Mercer county lands, and specific knowledge of that fact is not necessarily deduced from any situation or set of circumstances shown in the petition, nor from any notice charged by law of the probation and contents of the Randolph will in the courts of Virginia, in face of a distinct averment of the petition of want of knowledge or of opportunity for knowledge on the part of the ex-slaves and their descendants.

It is contended by counsel for the plaintiffs that the trust created by the will of John Randolph and transferred to the successive grantees of the real estate is a continuing and subsisting trust, and thereby excepted from the present statute of limitations, but that is immaterial for the reason that the statute of limitations in force at the time the cause of action arose controls, and that under the prevailing practice at that time legal limitations were not applied as between trustee and *cestui que trust* until after there had been an open denial or repudiation of the trust brought home to the *cestui que trust*. *Paschall* v. *Hinderer*, 28 O. S., 568; *Ham* v. *Kunzi*, 56 O. S., 531.

It is also contended in support of the demurrer that the executor having bought the land and taken the title in his own name had an absolute right to convey and restore thereby the funds to its original form, and that the rule requiring specific authority of the court or will does not apply. The effect of such conveyance as to an innocent purchaser need not be determined, for here the amended petition charges the successive purchasers with knowledge of the trust, and they are, therefore, bound by the trust.

It is argued that there is no sufficient showing or statement of facts as to fraud, but the averments showing breach of trust, intent to defraud, and fraudulent concealment are sufficiently broad and specific to pass the test of a general demurrer.

It is asserted that the provisions of the Randolph will were personal to the slaves and that the right did not descend. The act of March 3, 1834 (1 Curwen, 145), first brought into the statutes the rule of construction of wills holding the vesting of the estate in fee simple in the absence of words of succession. But independent of the statute, a devise was so construed even in the absence of words of succession. *Nile* v. *Gray*, 12 O. S., 320; *Piatt* v. *Cruton*, 37 O. S., 355; *Flickinger* v. *Saum*, 40 O. S., 600.

This is the law of Ohio and is presumed to be the law of Virginia in the absence of a showing otherwise, and therefore controls, whether the construction of the will for the purposes of this case be under the laws of either Ohio or Virginia.

Whether the term "settle" employed in the will is to be construed in harmony with plantation customs in slavery days, and applied as a sort of tenancy by sufferance, or in the more enlarged acceptation of the free states in which the investment was directed, it is not necessary to decide at this stage. The laws and customs of the state of Virginia, if competent at all to be engrafted upon the construction of the will, must be specifically pleaded and proven.

The investment of the funds in the real estate described and the taking of the title in the name of the executor impressed thereon a trust for the settlement of the slaves, and under the facts stated in the petition, the interest so conferred upon the slaves is one in fee simple.

The third amended petition, therefore, stating a good cause of action as against a demurrer, the judgment of the common pleas court should be reversed and the cause remanded with instructions to overrule the demurrer, and for further proceedings.

DONNELLY, J.: I agree with the majority of the court that the third amended petition is good as against a demurrer, but do not fully agree with the reasons given by the majority of the court.